

**SIGNED this 26th day of March, 2014.**

**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| John Hall Thomas, | § | No. 11-10997 |
| | § | |
| | § | |
| Debtor. | § | |
| | § | Chapter 7 |
| | § | |
| | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this claim determination, the Court must sit as fact-finder to decide the value of a 518 acre parcel of land near Horseshoe Bay just south of Highway 71, as of September 1, 2009, the date that parcel was foreclosed upon by a creditor. The Court determines that the property was worth $2,850,606. After deducting this amount from what was owed to the creditor as of the

1

foreclosure date, and adding certain interest charges, the Court calculates that the creditor's claim against the bankruptcy estate should be allowed in the amount of $1,215,000.53, in addition to various attorneys' fees, post-bankruptcy interest, and other charges, which the Court will determine at a later date.

The Court has considered the written submissions of the parties, the testimony given at hearings on January 23 and February 6, 2014, and the relevant law.  The Court has jurisdiction over this core matter pursuant to 28 U.S.C. § 157(b)(2)(B).  Although entry of a final judgment on Graham's claim may, as explained below, be delayed until certain further aspects of Graham's claim are resolved, the Court will have constitutional authority to enter a final judgment as part of the "process of allowing or disallowing claims." *Stern v. Marshall*, 131 S.Ct. 2594, 2616 (2011).

## I. Background

On August 14, 2007, John Hall Thomas borrowed $3.4 million from Graham Mortgage Corporation ("Graham").  The loan was secured by a 618.292 acre ranch located in the counties of Burnet and Llano.  *See* Ex. Cr-29[1] (non-homestead affidavit and description of property).

In 2009, Thomas defaulted on the debt and Graham initiated foreclosure.  *See* Ex. Cr-31 (notice of default), Ex. Cr-30 (foreclosure notice).  Before the foreclosure sale, Thomas sued Graham in Burnet County state district court on numerous grounds, including that the ranch was his homestead as of the date the loan was made.  Apparently to avoid risking a violation of Texas homestead law, Graham carved out 100 acres of the ranch as potential homestead, released its lien on that 100 acre tract, and then foreclosed on the remaining 518.292 acres (the "Subject

---

[1] The exhibits are referred to as "D-__," for the debtor, Thomas, and "Cr-__," for the creditor, Graham.

Property"). Graham purchased the Subject Property at the September 1, 2009 foreclosure sale for $2,257,214. As the parties have stipulated, as of the date of the foreclosure, Thomas owed Graham a total of $3,788,185.69. Pretrial Order on Am. Proof of Claim of Graham Mortg. Corp. and Debtor's Obj. to Am. Proof of Claim ("Pretrial Order"), ¶ 24 [Dkt. No. 291].

Graham counterclaimed against Thomas in February of 2011 for the deficiency of approximately $1.5 million. Thomas asserted his state law rights of appraisal under Texas Property Code § 51.003 with respect to this amount, because, he claimed, the fair market value of the Subject Property would have erased his entire indebtedness to Graham. Thomas also continued to maintain his homestead claim on the 100 acre tract. On April 21, 2011, the state court granted summary judgment to Graham, denying Thomas' homestead claim, upholding Graham's claimed deficiency, and denying Thomas an appraisal. Thomas appealed the ruling to the Third Court of Appeals in Austin.

Thomas also filed for relief under Chapter 11 of Title 11 of the United States Code on April 25, 2011 (the "Petition Date") [Dkt. No. 1], even though he had few creditors other than Graham. His bankruptcy case came before Judge Gargotta. In his bankruptcy filings, Thomas claimed the 100 acre tract as his exempt homestead. *See* Sch. C, Dkt. No. 137. Graham was granted relief from the automatic stay to allow the state court proceeding to continue to a final judgment and any appeal to be sought. Order Granting Modification of the Automatic Stay, Dkt. No. 36. The bankruptcy court reserved to itself the question of whether the 100 acre tract was a homestead as of the date of the bankruptcy petition—a different question from that before the state court, whether it was a homestead as of the loan date. *Id.* Ultimately, the bankruptcy court determined that the 100 acre tract was not a homestead as of the petition date, and this ruling was affirmed on appeal by United States District Judge Sam Sparks. *See* Amended Order Granting

3

Objection to Homestead Exemption, Dkt. No. 110; District Court Order, Dkt. No. 198. Moreover, because of Thomas' failure to propose a confirmable Chapter 11 plan, Judge Gargotta converted Thomas' case to Chapter 7, and Ron Satija was appointed as trustee to administer the estate.  Order Converting Case to Chapter 7, Dkt. No. 111.  Judge Sparks affirmed the conversion to Chapter 7.  District Court Order, Dkt. No. 196.  After the conversion, Thomas thwarted various of the trustee's attempts to administer the estate.  *See, e.g.*, Trustee's Expedited, *Ex Parte*, Motion for Order to Show Cause Why Debtor Has Failed to Comply With This Court's Prior Orders, Dkt. No. 203.

Meanwhile, on April 4, 2013 (as amended by opinion and judgment of July 24, 2013), Thomas' state court appeal was decided.   The court found in Graham's favor on most issues, including as to Thomas' homestead claim.  *See Thomas v. Graham Mortg. Corp.*, 408 S.W.3d 581, 588-91 (Tex. App.—Austin 2013, pet. denied) (concluding that "the evidence conclusively establishes that Thomas abandoned any homestead rights in the Property at the time of the loan agreement").  But the appeals court remanded on the deficiency claim, holding that Thomas was entitled to assert his state law right to an appraisal concerning the claimed deficiency as of the date of the foreclosure sale.  *Id*. at 592-94.

Shortly thereafter, Thomas, who had largely proceeded pro se before both state and federal courts but was finally represented by counsel, filed an ambitious motion [Dkt. No. 230] seeking multifarious relief from this Court.   The premise of Thomas' motion was that the appellate court's ruling had vitally altered the landscape in the bankruptcy court.  Specifically, by reinstating the possibility that Graham would have no remaining deficiency claim, Thomas argued that the bankruptcy case (that he filed) should be undone, and the bankruptcy trustee should have no role in administering the property of the bankruptcy estate.  This novel and

4

extreme position was based on the logic that once Graham's deficiency was gone, Thomas would have no creditors and so he should have his assets, including the 100 acre tract, returned to him. In essence, Thomas sought to turn back the clock on numerous orders of the Court—many of which Thomas had not complied with—including orders to turn over the 100 acre tract, and cattle thereon [Dkt. Nos. 182, 185, 213].

There was a procedural impropriety in all of this, in that these orders had long been final, and in light of the debtor's non-compliance with them, there was little reason to strain to find equitable grounds to suspend their effects, long after the fact.  Also, a substantive problem was that just because Graham's deficiency might be shrunk or even eliminated after state court proceedings ran their course, there was no reason under bankruptcy law that the trustee did not remain entitled, indeed obligated, to administer the estate and maximize it for the benefit of all creditors, including by selling non-exempt property.  Even if the trustee might be able to pay off all creditors and leave a surplus for Thomas himself, that possibility did not necessarily justify this Court's intervening to stop the trustee from liquidating the property in order to try to prognosticate what the estate's finances were in fact going to look like at the end of the day.  In sum, there were strong reasons to allow the trustee simply to go ahead with a sale of the remaining ranchland, which was not exempt—even if, at some future point, it might turn out that Graham's deficiency was smaller than originally asserted.  The trustee could always hand over any remaining funds to Thomas, after the estate had otherwise been administered.  That is the course Chapter 7 bankruptcy proceedings usually take.

On the other hand, the land had been in Thomas' family for generations and had sentimental value to him.  Also, even if some irrational exuberance might slant his view on likely outcomes, Thomas was right that there was a possibility that Graham's deficiency claim might

be diminished or even eliminated by the appraisal process.  Finally, it was true that Graham was by far the estate's largest creditor, so the ultimate amount of its claim really would determine the course of the bankruptcy case.  *See* Schs. D, E, F, Dkt. No. 131.

The Court crafted a remedy to take these factors into account and give Thomas a chance to sustain his position that Graham's deficiency was rightfully zero and that Thomas should be allowed to keep the remaining 100 acres of his family's ranchland.  The Court gave Thomas a choice:  either (a) proceed with the state court appraisal process, but in the meantime let the trustee proceed to liquidate the estate's property (including the 100 acre tract) and begin paying creditors and fees, holding the rest until the amount of Graham's deficiency (if any) had been ascertained; or (b) opt for the bankruptcy court to conduct the valuation proceeding, in which case the Court would withhold approval of the sale of the remaining 100 acres until Graham's deficiency claim was ascertained—thus leaving open the possibility that if Graham's deficiency claim were to be low enough, the trustee might not be forced to sell the land at all, potentially returning it to Thomas.  Order, Dkt. No. 236.

Thomas chose the second option [Dkt. No. 238], thus teeing up the present proceeding, at which the Court was left to value Graham's deficiency claim.   As the parties agreed in their joint Pretrial Order of January 10, 2004, the questions before the Court were the value, as of September 1, 2009 (the "Effective Date") of the Subject Property, and the pre-petition interest thereon (which accrued at a rate the parties have agreed upon).

With that background in place, the Court turns to the issues at hand.

## II. Valuation of the Subject Property

### A.  Characteristics of the Subject Property

The experts' reports provided numerous maps and extensive additional information about the Subject Property, all of which the Court has taken into account.  Some key characteristics of the Subject Property may be summarized as follows.

The Subject Property is located in central Texas and straddles the line between Burnet and Llano counties.  It lies a couple of miles south of Lake LBJ, on the other side of Texas State Highway 71 from Horseshoe Bay, a golf, tennis, and aquatic-recreation resort community along the shores of that lake and the Colorado River.  By contrast to the fairly dense development on the north side of Highway 71, there is only one small subdivision, called the Overlook, in close proximity to the Subject Property and on the same side of Highway 71.  *See* Jan. 23, 2014, Hearing Transcript, Dkt. No. 306 ("Tr.") 60-61; Ex. Cr-6 at iv.

The Subject Property has narrow frontage of about 350 feet on Highway 71; from there a thin neck, about a mile long, connects the main body of the Subject Property to the highway, although the ranch road along this neck "meanders" at times into the 100 acre lot still owned by Thomas.  Tr. 95-96; Ex. D-17 at j. Due both to the cut-out of the 100 acre lot and the long neck, the overall shape of the Subject Property is quite irregular.  *See* Ex. Cr-4 at 25.

The Subject Property has few improvements aside from a couple of fences, gates, and ranch roads.  There are a couple of wet-weather creeks and ponds.  Tr. 62, 93, 213.  There is a powerline easement and a gas pipeline easement, which cut diagonally across the property and negatively impact the property's value.  *See generally* Tr. 13-16, 98-99; Ex. D-3.  There is groundwater and electricity access, and the land's gentle terrain makes it favorable for development.  Tr. 93-94.

**B.  Lay Testimony**

Although this case largely boils down to a battle of the experts—the three real estate appraisers—other witnesses offered useful testimony.

Dr. Thomas offered helpful testimony about the location and physical characteristics of the property, which is a portion of a larger tract that was in his family for three generations.  He received his property after a partition among siblings.  Tr. 17-20.  Dr. Thomas testified about how he came to borrow from Graham and give Graham its mortgage, and attempts he made to sell the property.  Tr. 24-25, 30-31.  His opinion of value, which was $8500 per acre to $10,500 per acre, cannot be given much if any weight, but it does explain his attempts to hang onto the property through this protracted bankruptcy case.  Tr. 58-59.  His opinion appears influenced by the fact that his sister was able to sell her 480 acre tract, located north of Highway 71, at $15,700 per acre.  But she sold at a time, June of 2007, that all experts would agree was a much better market for real estate, and the location of the land is distinct—as Thomas himself testified, his sister's property was located very near to, and not separated by a major highway from, the facilities at Horseshoe Bay.  Tr. 23-24.  True, Dr. Thomas received three offers to buy his property for amounts considerably in excess of even the appraisal of Thomas' own expert, but the first two were dated prior to 2008, and none closed, the last because the buyer was unable to obtain financing.  *See generally* Tr. 32-37, 53-55, 63-66; Ex. D-12.  These offers are of little probative weight in the valuation dispute here.

The Court was also helped by the testimony of Brad Goebel.  Goebel was the broker retained first by Dr. Thomas, and then by Graham, to sell the property.  He testified credibly to the effect that the unusual configuration of the property was an impediment to sale, as were the two significant easements on the property.  *See* Tr. 215-17.  He also testified that if Graham could have gotten $7500 per acre for the property after the foreclosure, he believed it would have

accepted that offer.  Tr. 208-09, 214.  He gave credible assurances that the property has at all times been marketed in a professional manner.

Finally, Dean Castelhano gave helpful and credible testimony.  Castelhano is an owner of Graham, has been actively engaged in the underwriting process, and is qualified as an appraiser (although he did not here provide a valuation opinion).  Castelhano testified that the global financial meltdown that occurred in 2008 had such a negative impact on the real estate markets that he refers to it as the time that "the world changed."  Tr. 249-50.  This observation is consistent with evidence from all three appraisers (although they of course gave different opinions of how the market decline affected value as of the Effective Date).  Castelhano confirmed that Graham would have accepted an offer of $7500 per acre, had it actually been firm and on commercial terms.  Tr. 245-46.  This testimony was consistent with Goebel's testimony that the offer received at that price point was not a "solid deal," and that if it had been, it would have been accepted.  Tr. 208-09.  All of this is consistent with the Court's view that given the actual fair market value of the land as of the Effective Date, to sell the land at $7500 per acre would have been a very good deal for Graham.  It is no surprise that money on that scale did not come through, particularly given the other valuation evidence discussion below.

## C. The Battle of the Experts

The Court turns now to the testimony of the experts.

Thomas relied on one expert, Chris Griesbach, whose report was introduced into evidence as Ex. D-17 and whose proffer [Dkt. No. 301] was admitted as Ex. D-50.  Graham used two experts, Monte Ezell, whose report is Ex. Cr-6, and Martyn Glen, whose report was introduced as Ex. Cr-4 and whose proffer [Dkt. No. 299] is Ex. Cr-42.  The three experts were all qualified to provide opinions of fair market value as of the Effective Date, all of their testimony was deemed admissible, and the Court has carefully considered their testimony and other

evidence upon which they based their opinions.  Although this discussion is far from exhaustive in terms of the factors the Court has considered in reaching its findings, the Court here explains the weight it gave to various key parts of their evidence as part of its fact-finding exercise.

    1.  Areas of Agreement

Although their ultimate opinions diverged, there were large areas of agreement among the three experts.  The experts all agreed that by the Effective Date, the property had lost value compared with earlier time frames, although there was some conflicting testimony, not particularly relevant, as to how close September 2009 was to the bottom of the market.  All experts agreed that by the Effective Date, it was, at a minimum, very difficult to get the amount and type of financing that would have been required to purchase the Subject Property.  *See, e.g.*, Tr. 118-19, 161.  They also agreed that residential development in the area had been slowed as of the Effective Date as compared with earlier periods.

For all of these reasons, the experts agreed the highest and best use was to buy and use for ranch/agricultural/recreational purposes; Ezell and Griesbach also included some contemplation of eventual development into residential lots, if and when demand for such development materializes.  Tr. 96-97; Ex. Cr-6 at 9-11; Ex. Cr-4 at 35; Ex. D-17 at iv.  At trial, Griesbach hedged (and at times arguably contradicted) this conclusion somewhat, damaging his credibility in doing so.  *See infra* § II.C.2.  In any case, the highest and best use was a topic on which there was more agreement than disagreement.

All experts used the sales comparison approach for their primary valuation opinions.  Ex. D-17 at 18; Ex. Cr-6 at 3-4; Ex. Cr-4 at 4.  Glen also used the cost approach on a very limited basis.  Ex. Cr-4 at 43.

All agreed that the appropriate "exposure period," or the holding period within which the hypothetical sale at the price appraised should occur, would be 12-14 months.  Ex. Cr-4 at 44; Ex. D-17 at 33; Ex. Cr-6 at 26.

The experts agreed that in valuing ranch land, it may be necessary to look at comparables located some distance away.  Indeed, this was borne out in their appraisals, as all three used some comparables that were some twenty-five or thirty miles away.  *See, e.g.*, Tr. 166-67.

Each expert "adjusted" the comparable sales to factor in differences between the comparison property and the Subject Property, although none rigorously explained the manner in which the percentage adjustments were made.  Though less precise than might be desired, their adjustment testimony was nonetheless admitted.  "Alleged 'gaps' between the comparable sales data and the conclusions drawn from it may go to the weight of an appraiser's testimony but not to its admissibility.  We nevertheless review the adjustments to determine whether too great an analytical gap exists from the data to the adjustment."  *Williams v. Texas*, 406 S.W.3d 273, 286 (Tex. App.—San Antonio, 2013, pet. denied) (citation omitted).   In this case, there was not so much of an "analytical gap" as to preclude admission of the evidence.  But while the Court admitted and considered the experts' opinions (including their adjustments), some of the comparables and some of the adjustments, as explained below, were too dramatic and ill-explained for the Court as fact-finder to give them much weight.

2.  Griesbach

The credibility of Thomas' expert, Chris P. Griesbach, was damaged in several different ways, such that in the end, the Court gave little weight to his evidence.

**Choice of comparables**.   Most importantly, Griesbach used comparables from time periods long before the Effective Date, and indeed long before the financial crisis.  *See* Ex. D-17 at 29; Tr. 128-31, 144 (an average of thirty-three months prior to the Effective Date for the nine

comparables in his expert report).  The extensive market evidence in the record demonstrates that values had fallen precipitously, and financing was scarce as of the Effective Date.  All told, Griesbach's selection of comparables was hard to understand.  The problem with choosing sales that were from earlier periods of time is illustrated by comparing Griesbach's Comparable #11, which sold for $12,000 per acre in 2007, to Ezell's Comparable #5, which was located in very close proximity, but sold in 2011 for $5,666 per acre.  Also, some of Griesbach's comparables were from locations in close proximity to the river; two were from right off Highway 71 just outside Bee Cave, a location far closer to Austin than is the Subject Property; and some were far more closely related to the Horseshoe Bay resort on the north side of Highway 71, which would raise values.  *See* Tr. 163-66.

Related to these points, Griesbach's adjustments were very large, one at 39%, three at about 45%, and one an amazing 75%.  *See* Ex. D-17 at 29 (summarizing); Tr. 167-68.  With adjustments that large, and particularly considering the inevitably somewhat imprecise nature of the adjustment process, it is hard to see how those sales could truly be considered "comparable." The Court finds them to be of minimal use, if any.

At trial, Griesbach testified about four new comparables that were not in his appraisal report.  No satisfactory explanation was offered at closing as to why those four were left out of the original report.  *See* Tr. 116 ("I ran across four sales that in my initial search hadn't come up. And so I discovered four—four sales in doing that—that exhaustive search, that I went 'Well, you know, I—I should have used these sales in my original report.'  And so I looked at them and I thought 'Yeah, I've got to—I've got to supplement my report.'").  These belated comparables do not change the Court's analysis, either for or against Griesbach, but their belated selection certainly does not bolster his credibility.

**Highest and best use**.  As noted, Griesbach's report conceded that the Subject Property's highest and best use was as a "[r]anch for raising livestock and recreational uses," with some future "[p]otential for future large acreage residential development with 5-10 acre lots."  Ex. D-17 at iv.  As Griesbach's report explains, the appraisal concept of "highest and best use" means "[t]he reasonably probable and legal use of vacant land . . . which is physically possible, appropriately supported, financially feasible, and results in the highest value."  Ex. D-17 at 25 (quoting Appraisal Institute, *The Appraisal of Real Estate* (12th ed. 2001)).  The "use must be probable and not speculative or conjectural, [and] there must be a profitable demand for such use."  *Id*.  Given this, it seems plain that, while residential development years down the line was (as it still remains today) an eventual *possibility*, there was no currently "profitable demand" for it as of the Effective Date.  Indeed, Griesbach's report itself confirms this:  "The appraiser is of the opinion that as of September of 2009 the market was stalled and thus the highest and best at the time would be for continued ranch use for livestock and recreational use."  Ex. D-17 at 27.  Griesbach's report had it right:  as of September 2009, the highest and best use of this land was as ranchland, for agricultural and recreational use.  Eventual residential development was a possibility, and a possible contributor to value (as indeed it would be with most vacant land near other settlements or roadways), but was not the highest and best use in the "present tense."

At trial, Griesbach tacked in the other direction, several times saying that the highest and best use was as residential property.  Tr. 96-97, 119-20, 158-60.  Though these statements were sometimes qualified somewhat (especially in the face of cross-examination), by the important caveat that this was only an eventual prediction and not a present reality as of the Effective Date, the Court still found that this attempt to shift the focus of his "highest and best use" opinion undermined Griesbach's credibility, particularly given the lack of evidence of interest in

residential development more broadly as of the Effective Date.  Griesbach's equivocation on this point at trial undermines his credibility.

**Other issues**.  Griesbach used a "market analysis" that was developed through a means that was not adequately explained, and, when questioned about it on cross, the witness became visibly uncomfortable.  *See* Tr. 107-09, 118-19, 149-56.  He provided no satisfactory explanation of his analysis.

Moreover, Griesbach made few if any adjustments for the shape of the property, when all other appraisers did, and Goebel, the broker for the property, testified credibly that the shape did harm efforts to market the property.  *See* Tr. 97-98, 168.

Finally, Griesbach did not enhance his credibility when he argued that the offers obtained by Thomas on the land corroborated his opinion.  *See* Tr. at 89-91.  These offers show, if anything, that the market for the Subject Property was quickly evaporating, at least at the desired price range.  The transactions did not close, and indeed, the last of the offers failed precisely for lack of financing and thus aptly characterizes the period around the Effective Date, according to the market evidence.

**Conclusion**.  Griesbach's opinion was that the property could be sold within 12 months of the Effective Date for $8150 per acre.  Tr. 117-18, Tr. 178-79.  As a result of all of the factors above and the Court's own observations concerning Griesbach's general credibility in light of all the facts in evidence, the Court gives little weight to the Griesbach appraisal.

### 3.  Glen

When considering his written materials alongside his testimony, the Court finds Glen's appraisal to be the most useful and credible of the three.

Glen differs from the other two appraisers in that he apparently gives no value to the possibility of future development.  In turn, this drives his selection of comparables, which were

all from northern Burnet County. The Court has struggled with how to account for this factor. On the one hand, Thomas's counsel argues forcibly that proximity to Horseshoe Bay and the possibility of future development are important to the valuation of the property, and his argument resonates with both logic and common sense. (Though this common sense is somewhat undermined by the observation that in 2014, well into what all experts agree is an improving market for real estate, the only development on the south side of Highway 71 is the Overlook development, and that development does not enjoy the amenities of the resort.)

The weight to be given to the prospect for future residential development is determined by the market evidence. When viewed from 2009 when prospects were bleak and other developments (such as Skywater on the north side of Highway 71, quite near to Horseshoe Bay) were going into foreclosure, *see* Tr. 134-37, 161-62, the residential development possibility seems so speculative and remote in time as to add little if any present value to the Subject Property as of the Effective Date. In sum, in weighing the evidence, the Court has gone from thinking Glen was wrong on this point to thinking Glen may have been the one appraiser who was right. Glen himself did not deny that residential development was a *desideratum*, when demand materialized. He merely opined that, as of the Effective Date, the prospect was too remote to be a significant determinant of value. In 2009, the buyer was exceedingly unlikely to be a residential developer; rather, it would be a rancher or recreational user intending to enjoy the land as such until interest in residential development picked up considerably. In any case, this area of partial disagreement is of little note because, as discussed below, the Court ultimately looked to a combination of Glen's and Ezell's appraisals to be instructive on its fact-finding on valuation, and after some adjustments in the relative weights of the comparable sales evidence by the Court, each appraiser's evidence pointed in the same direction.

15

Glen used a trainee, Cameron Schuster, to gather information for the appraisal. Although counsel for Thomas suggested this should undermine the value of Glen's appraisal, the Court does not find this troubling. There is no indication that the work was actually deficient as a result of Schuster's involvement. Glen testified that he closely supervised the trainee, and Glen himself explained every aspect of the work product ably at trial.

Counsel for Thomas attempted to make much of the appraisal of the Skywater development that Glen performed in February 2011, Ex. D-7, and of the supposedly different approaches used by Glen in evaluating a tract of raw land in connection with that appraisal. However, Skywater is directly adjacent to Horseshoe Bay, and Glen testified to numerous extraordinary assumptions and conditions that were placed on that appraisal. These facts suggest to the Court that the approaches taken with the two appraisals were not so much inconsistent as different exercises requiring different techniques.

Hurting Glen was his testimony that he found no ranches close to the subject property in 2009, which means he overlooked Ezell Comparable #3, which seems like a useful comparable sale. The parameters of Glen's searches, explained in his report, are revealing. *See* Ex. Cr-4 at 37. He searched only Burnet and Llano counties, and only for transactions from March to July 2009, several months before the Effective Date. These parameters appear to be narrower than might be desired. Nonetheless, others of his comparables are very pertinent, and he made numerous valuable comments.

The Court does not find Glen's Comparable #1 to be a credible data point, because its predominant features—namely, as a more remote, lakefront property—simply do not stack up well with the Subject Property. In contrast, although Glen's Comparables #2, #3, and #4 are somewhat distant from the Subject Property, they are actually much closer to Austin than

Comparable #1 (and more comparable to the Subject Property's distance from Austin), and not lakeshore.  They make more sense as comparables.  Still, these three comparables are located some distance from Highway 29, and it is not clear to the Court whether Glen's upward adjustment of 7.5% is enough to compensate for this disadvantage.

Overall, the Court finds Glen's report and testimony more credible than that of Griesbach, but questions the choice of Comparable #1 and the degree of adjustment on the other comparables.  For these reasons, the Court believes that his opinion, while generally credible, understates the value of the Subject Property somewhat.

<u>4. Ezell</u>

Graham's other expert, Ezell, also testified credibly and offered useful comparable sales.

Counsel for Thomas challenged Ezell on the basis that some of his comparable sales were after the Effective Date.  Ezell testified convincingly as to why using comparables dating from after the effective date was valid.  In short, if market conditions are unchanged or changed relatively little between the Effective Date and the post-Effective Date sales, as seems to be largely the case here, then the post-Effective Date sales are useful comparable sales.  In contrast, due to the unusual circumstances of the market crash discussed by all the experts, we know that markets were materially different at the Effective Date than they were prior to the market crash.  Thus, sales from long prior to the Effective Date, as were used by Griesbach, are far less comparable than those sales reasonably soon after the Effective Date.  In sum, the Court had no conceptual problem with Ezell using post-Effective Date sales, provided that they were well-explained and supported by market data and analysis, as they were.

Texas courts, exercising their gatekeeper and not fact-finding functions, have admitted and allowed consideration of post-effective date comparables as part of expert appraisal testimony.  *See, e.g.*, *Williams*, 406 S.W.3d at 285 ("Comparable sales . . . should take place near

in time to the condemnation," but "[c]omparable sales are generally admissible unless it appears that reasonable minds cannot differ from the conclusion that the evidence of other sales lack probative force because of their dissimilarity to the condemned property") (citations omitted); *id.* at 287 (admitting some comparison sales evidence from after date of valuation). Here, based on the testimony provided by Ezell concerning market conditions after the Effective Date, the use of post-effective date sales is not so beset by "analytical gaps" that it should be denied admission. Rather, the fact-finder (in this case the Court), should consider the time frame and other aspects of the comparable sales in giving them appropriate evidentiary weight. This the Court has endeavored to do.

After careful consideration, the Court here finds some of the later comparables to be useful, namely Comparables #2, #3, and #5. The Court did not find Ezell's Comparable #4 to be useful. It was farther from Austin than is the Subject Property and not convincingly comparable. It is not clear the overall 34% adjustment applied was adequate, and such a high adjustment confirms the sense that the sale is not particularly useful in valuing the Subject Property.

The Court found Ezell's Comparable #1 credible. Among other things, this property is about the same distance from Austin as the Subject Property, and although not close to Horseshoe Bay, it does have proximity to San Antonio, which Ezell credibly testified had value.

Both in his report and at trial, Ezell gave testimony concerning the state of the market at the time of the Effective Date. His research into the market trends as of the Effective Date enhanced his credibility in assessing the value of the Subject Property. Importantly, he offered evidence concerning the (diminished) volume of new residential developments, new ranch land purchases, and decline in the availability of financing, all of which are directly pertinent to valuation of the Subject Property. He also credibly testified as to the lack of demand in the area

around the Subject Property as of the Effective Date, in fact noting that several attempted developments failed around the time of the Effective Date, bolstering the conclusion that it was exceedingly unlikely a developer would pay any premium to gamble on the Subject Property as of the Effective Date.

No doubt, adjustment of comparables is more art than science.  "Appraising property is not an exact science based on set mathematical formulas."  *Harris Cnty. Appraisal Dist. v. Kempwood Plaza Ltd.*, 186 S.W.3d 155, 161 (Tex. App.—Houston [1st Dist.] 2006, no pet.).  But the Court found Ezell's explanations of adjustments to comparables (including on cross-examination) more credible than that of the other two appraisers.

Although Ezell was the only one of the three appraisers who did not have an MAI appraisal designation, he is a State of Texas certified appraiser, and his testimony was clear, consistent, and credible.

### 5. The Court's Valuation

"[A]ll appraisal opinion is at best something of a speculation, and the question of market value is peculiarly one for the fact finding body."  *Williams*, 406 S.W.3d at 284 (quoting *LaSalle Pipeline, LP v. Donnell Lands, L.P.*, 336 S.W.3d 306, 315 (Tex. App.—San Antonio 2010, pet. denied)).  While valuation, particularly more than four years after the fact, is difficult to pin down with any precision, the Court, acting as fact-finder, has carefully studied the reports of the experts, weighed their testimony concerning the market at the time, and has reached an opinion as to valuation.  The Court finds that the Subject Property was worth $5500 per acre, for a total of $2,850,606, as of the Effective Date.

The Court has sought to explain its valuation as thoroughly as possible in this opinion, but the value does not rely on any one subsidiary finding or conclusion.  Rather, as the Court worked through the relevant issues from several different perspectives, each different route

19

seemed to lead in the direction of the Court's finding.  In light of the extensive record leading in this direction, the Court is very comfortable with the finding that the Subject Property was worth far less than Griesbach opined, but somewhat more than suggested by Ezell and Glen.

As far as the specific number, the Court reaches it as follows:

If one were to take the Glen appraisal, eliminate Comparable #1, and average the rest without adjustment, one would arrive at a $5381 per acre figure.  The Court believes these sales should be adjusted upward to account for the fact that each of these properties is some distance from a major highway.

If one were to take Ezell's appraisal, eliminate Comparable #4, and average the rest without adjustment, the value would be $5286 per acre.  The Court finds that Ezell Comparables #1 and #5 appear most apt, but that the 17% downward adjustment to these two sales—both from just over $5600 per acre down to around $4500 per acre—was too drastic, having the effect of understating the value of the Subject Property.

Each of these approaches independently leads the Court to conclude that the appropriate valuation is $5500 per acre, or, for all 518.292 acres, a total of $2,850,606.

As noted, the total owed as of the foreclosure date was $3,788,185.69.  Using the Court's valuation, this leaves the deficiency owed to Graham as of the foreclosure date, of $937,579.69.

### III. Interest on the Deficiency Claim

The parties have also stated that they wish the Court to determine the "applicable interest on . . . [the] deficiency claim from September 1, 2009 through the Petition Date (before considering post-foreclosure attorneys' fees, expenses, and any interest thereon)."  Pretrial Order, ¶ 2.

The non-default, contract rate of interest was originally 13% on Graham's loan to Thomas, and the default rate was 18% per annum. *See* Ex. Cr.-27 (Deed of Trust). The parties have agreed that the 18% rate applies to determine post-foreclosure interest. Pretrial Order, ¶ 25.

By the Court's calculation, then, the interest due on the deficiency amounted to $168,764.34 per year, or $462.37 per day. There were 600 days between September 1, 2009 (the Effective Date) and April 25, 2011 (the Petition Date), for a total interest accrual of $277,420.84 (i.e., 600 x $462.37).[2] Thus, as of the Petition Date—leaving aside post-foreclosure attorneys' fees, expenses, and any interest thereon, which should be added as appropriate and subject to the Court's further consideration—the total sum due to Graham on its deficiency claim and interest thereon was $937,579.69 plus $277,420.84: that is, $1,215,000.53.

## IV. Conclusion

For the reasons stated above, the Court finds that the total sum due to Graham on its deficiency claim, together with interest thereon through the Petition Date but not including attorneys' fees or other appropriate charges, is $1,215,000.53.

The Court will set a hearing date and briefing schedule at which any further matters at issue between the parties can be resolved.

---

[2] The Court's calculation methodology mirrors that engaged in by Graham in Ex. Cr-36, adjusted for the Court's different valuation of the deficiency.